**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **MICHAEL A. TERUGGI,** ) | |
| ) | |
|     **Plaintiff,** ) | |
| ) | **No. 11 C 216** |
|     v. ) | |
| ) | **Judge Ronald A. Guzmán** |
| **THE CIT GROUP/CAPITAL** ) | |
| **FINANCE, INC. d/b/a CIT RAIL,** ) | |
| ) | |
|     **Defendant.** ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff has sued defendant for its alleged violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, the Illinois Human Rights Act, 775 Ill. Comp. Stat. 5/2-102, and for discharging him in retaliation for exercising his rights under the Illinois Workers' Compensation Act. Defendant has filed a Federal Rule of Civil Procedure ("Rule") 56 motion for summary judgment. For the reasons set forth below, the Court grants the motion.

**Facts**

On July 7, 1997, plaintiff started working for defendant, a company that leases locomotive and freight cars, in leasing and sales. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 1-2.)

On April 10, 2002, plaintiff suffered a work-related injury that ultimately resulted in the amputation of his right little finger and the bones that connect it to his wrist. (*Id.* ¶ 3.) After the injury, plaintiff was still able to perform the functions of his job, but his speed and accuracy in working on the computer decreased significantly. (Def.'s Ex. 2, Pl.'s Dep. 93-94.) Plaintiff asked his supervisor, George Cashman, for a left-handed keyboard and an external drive for his computer,

so he would not have to carry his computer around. (*Id.* 94-95.) Cashman denied the former request but granted the latter. (*Id.*)

In 2005, plaintiff filed a complaint with the Illinois Worker's Compensation Commission, which was settled in May 2007 for $35,000.00. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 6.)

In 2007, defendant created the position of Senior Vice President and General Manager of Locomotives to oversee locomotive leasing and maintenance. (*Id.* ¶ 7.) Plaintiff applied and was interviewed for the job, but not until after defendant had offered it to Dan DiStefano. (*Id.* ¶¶ 8-10, 14.) DiStefano accepted the offer and started to work for defendant in September 2007. (*Id.* ¶ 14.)

On February 20, 2008, plaintiff received an email from another employee of defendant, George Sullivan, with the subject listed as "Competitive Information." (*Id.* ¶ 15.) The email stated that "Richard Latini has been promoted to head the sales group at Babcock and Brown," one of defendant's competitors, and "[a]ll [of] their sales personnel will now be reporting directly to Richard." (*Id.*) Immediately after receiving it, plaintiff forwarded the email to Latini. (*Id.* ¶ 16.)

The next day, one of defendant's managers discovered that someone had sent Sullivan's email to Latini. (*Id.* ¶ 17.) Cashman, who knew that Latini and plaintiff were close friends, suspected that plaintiff had sent the email. (*Id.* ¶ 18.) Cashman and defendant's Human Resources managers thought it was improper for plaintiff to have sent the message to one of defendant's competitors. (*Id.* ¶¶ 17-20.) Shortly thereafter, Cashman authorized Susan Keifer, Vice President of Human Resources, to monitor plaintiff's emails. (*Id.* ¶ 20.)

Keifer did not look at all of plaintiff's emails. (*Id.* ¶ 21.) Rather, she focused on the emails plaintiff sent to recipients not affiliated with defendant. (*Id.*)

On August 18, 2008, defendant's Chief Counsel sent the following email to all employees:

2

> In connection with the performance of your responsibilities for [defendant], you may receive and/or have access to certain commercially sensitive information, including without limitation, TRAC rates, lease expiration dates, pipeline reports, operating lease reports and availability reports.
>
> This email is intended to serve as a reminder that such information constitutes proprietary information covered under [defendant's] Code of Business Conduct. Under the Code, you are required to protect the confidentiality of all proprietary information. Such information should not be shared outside of [defendant] or otherwise used for any purpose beyond what is required for performance of your responsibilities for [defendant]. For avoidance of any uncertainty, you should not email proprietary information to any non-[defendant] email address or retain copies for your personal files.

(Def.'s Ex. 2, Pl.'s Dep., Ex. 3 Email from Singer to All Employees (Aug. 18, 2009).)

Between January 16, and 22, 2009, plaintiff exchanged several emails with David Nahass of Railroad Financial, a company that specializes in financing for rail projects, James Schnabel of Electro-Motive Diesels ("EMD"), one of defendant's suppliers, and Lawrence Beal, of National Railway Equipment Company, a locomotive rebuilding and manufacturing company. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 30; Def.'s Ex. 2, Pl.'s Dep. 161-64.) On January 16, 2009, Nahass emailed plaintiff: "How many new units were delivered in 2008 and projected for 2009?" (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 31.) Plaintiff then emailed Schnabel: "I'm being asked by our NY folks how many new locomotives were built in 08 and what is the projection for 09?" (*Id.* ¶ 32.) On January 21, 2009, Schnabel emailed the numbers to plaintiff, who forwarded the email to Nahass and Beal. (*Id.* ¶¶ 33-34.)

On January 27, 2009, Keifer discovered these emails. (*Id.* ¶ 40.) After consulting with Cashman and DiStefano, Keifer determined that the information plaintiff had given Nahass and Beal was confidential, could not be obtained from publicly-available sources, and no one in defendant's New York office had asked plaintiff to obtain it. (*Id.* ¶¶ 41-43.)

3

Thereafter, defendant started an internal investigation headed by Senior Vice President of Human Resources Tessie Massa and internal auditor Art Tyrell, who interviewed plaintiff, Cashman and DiStefano. (*Id.* ¶¶ 20, 44-46.) After the interviews, Massa and Tyrell concluded that: (1) plaintiff had used deceptive language, *i.e.*, "our NY folks," to obtain the data from Schnabel; (2) he did not have Schnabel's permission to give the data to Nahass and Beal; (3) his explanations for his actions were incredible; and (4) his actions violated defendant's Code of Conduct. (*Id.* ¶¶ 47-48.) Consequently, Massa recommended that plaintiff be discharged, and Cashman, who was fifty-five years old, accepted the recommendation. (*Id.* ¶¶ 49-50, 55.) On February 2, 2009, defendant discharged plaintiff at the age of fifty-nine. (*Id.* ¶¶ 51, 55.)

## Discussion

To prevail on a summary judgment motion, "the movant [must] show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage, we do not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

## Federal Claims

In Counts IV and V of the first amended complaint, plaintiff alleges that defendant discharged him because of his age and disability in violation of the ADEA and ADA. He contends that these claims survive summary judgment because there is evidence sufficient to support an inference of

discriminatory intent, including: (1) the disproportionate nature of the "punishment" to his "crime"; (2) the lack of evidence that the information he gave to Nahass and Beal was actually confidential or his publication of it caused any damage; (3) evidence that plaintiff told his boss, DiStefano, and Schnabel's boss, Cavanaugh, that he was going to share the information with Nahass and Beal; (4) the fact that Cavanaugh also sent the data to Nahass; (5) the brevity of the investigation into his actions and the lack of evidence that he violated defendant's Code of Conduct; (6) comments his supervisors made to him about his age and disability; and (7) defendant's hiring a younger person to take over many of plaintiff's duties. *See Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011) (stating that an ADA plaintiff can survive summary judgment by offering circumstantial evidence from which an inference of discriminatory intent can be drawn, such as: "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action"); *Van Antwerp v. City of Peoria*, 627 F.3d 295, 298 (7th Cir. 2010) (stating that an ADEA plaintiff may use the same kind of evidence to defeat a summary judgment motion).

Plaintiff's first assertion is not supported by the record. There is no evidence about the sanctions, if any, that defendant normally levies for an employee's publication of information it deems confidential, let alone facts that suggest younger or non-disabled employees are permitted to do so with impunity.

Plaintiff's second assertion, that there is no proof that the information from Schnabel was actually confidential or its publication caused damage, is beside the point. The issue in this case is whether defendant instructed its employees not to disclose the information, and plaintiff admits that

5

it did, not whether the information merited confidential treatment. (*See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 24-25; Def.'s Ex. 2, Pl.'s Dep., Ex. 3 Email from Singer to All Employees (Aug. 18, 2009).)

Plaintiff's third assertion is equally unsupported. There is no dispute that plaintiff sent Schnabel's email containing the production estimates to DiStefano, but there is no evidence that plaintiff told DiStefano he had sent, or was going to send, that information to Nahass or Beal. (Def.'s Ex. 6, DiStefano Dep. 125-26.) Similarly, there is no evidence that Schnabel's boss, Cavanaugh, knew that plaintiff was going to give the data to Nahass and Beal, and only inadmissible hearsay that suggests Cavanaugh knew, after the fact, that plaintiff had done so. (*See* Def.'s Ex. 2, Pl.'s Dep. 231 (testifying that he spoke to Cavanaugh "a week or ten days" after he gave the data to Nahass and Beal, and Cavanaugh thanked him for doing so).)

The record supports plaintiff's fourth assertion, that Cavanaugh also sent the data to Nahass. (*See* Pl.'s Ex. 5, Nahass Decl., Ex. 1, Email from Cavanaugh to Nahass (Jan. 20, 2009).) However, that fact does not help plaintiff's case because: (1) Cavanaugh's willingness to share the data does not excuse plaintiff's doing so in the face of defendant's contrary instructions; and (2) Cavanaugh's sending the data to Nahass undermines plaintiff's claim that Cavanaugh knew plaintiff had sent it.

Plaintiff's next contention is that the brevity of the investigation into his conduct supports an inference of discriminatory intent. There is no evidence as to the usual length or depth of defendant's investigations into alleged employee misconduct. Consequently, there is no basis for inferring that this one was too shallow or short. Moreover, plaintiff admits that, before defendant launched an official investigation, it already knew: (1) he had emailed Schnabel's data to Nahass and Beal; (2) DiStefano and other management employees considered the data to be confidential; (3) plaintiff had couched his data request to Schnabel as one from "[o]ur NY folks"; and (4) no one from defendant's New York office had asked for the data. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 40-43.) Given the record,

the inference plaintiff asks the Court to draw, that a lengthier investigation was required, is simply not reasonable.

Plaintiff's claim that the alleged Code of Conduct violations are baseless is equally flawed. The undisputed evidence discussed above provides ample support for defendant's belief that plaintiff engaged in conduct that "reflect[ed] unfavorably on . . . [his] own integrity or that of [defendant]," disclosed confidential or proprietary information belonging to one of defendant's suppliers and was untruthful during an internal investigation, all of which violate the Code. (*See id.* ¶ 48; Def.'s Ex. 9, Massa Dep., Ex. 4, Code of Conduct 1, 4, 11.)

Plaintiff fares no better with the last pieces of his evidentiary mosaic, that he was, in essence, replaced by a younger, non-disabled employee and his supervisors made comments to him about his age and disability. The former contention is supported by nothing more than speculation. There is no evidence that DiStefano is younger than plaintiff, that he is free of disabilities or that he assumed any of plaintiff's duties. On the contrary, plaintiff admits that he worked with DiStefano for eighteen months before his discharge. (Pl.'s LR 56.1(b)(3)(B) Stmt ¶¶ 1, 14.) With respect to comments, the record shows that Cashman made "a couple" of references to plaintiff's age in meetings at unidentified times, asked plaintiff twice between 2005 and 2007 how long he was planning to keep working and made "two or three" joking references to plaintiff being on drugs for his hand. (*Id.* ¶¶ 61-63.) There is no evidence, however, that Cashman made any of these comments at that time of or in reference to plaintiff's discharge. Thus, they are not evidence of discriminatory intent. *See Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) ("[I]solated comments that are no more than stray remarks in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus." (quotation omitted)).

In short, the facts plaintiff offers in support of his claims do not, alone or in combination, suggest that defendant discharged him because of his age or disability. Defendant is, therefore, entitled to judgment as a matter of law on plaintiff's ADEA and ADA claims. *See Van Antwerp*, 627 F.3d at 298 ("Whatever circumstantial evidence is offered . . . must point directly to a discriminatory reason for the employer's action." (quotation omitted)).

**State Claims**

Because the record, viewed favorably to plaintiff, does not suggest that defendant's stated reason for discharging him was pretextual, defendant is also entitled to judgment as a matter of law on plaintiff's IHRA and retaliatory discharge claims. *See Zaderaka v. Ill. Human Rights Comm'n*, 545 N.E.2d 684, 687 (Ill. 1989) (stating that IHRA age discrimination claims are analyzed in the same way as ADEA claims); *Luckett v. Human Rights Comm'n*, 569 N.E.2d 6, 14 (Ill. App. Ct. 1989) ("When analyzing claims of discrimination under the [IHRA], Illinois courts have looked to the standards applicable to analogous federal claims."); *see also Grabs v. Safeway, Inc.*, 917 N.E.2d 122, 126 (Ill. App. Ct. 2009) (stating that the causation element of a retaliatory discharge claim is lacking if defendant has "a valid, nonpretextual basis" for the discharge). Thus, defendant is entitled to judgment as a matter of law on the claims plaintiff asserts in Counts I-III of the First Amended Complaint.

**Conclusion**

For the reasons set forth above, the Court finds that there is no genuine issue of material fact as to any of the claims plaintiff asserts against defendant, which is entitled to judgment as a matter of law. Therefore, the Court grants defendant's motion for summary judgment [33] and terminates this case.

**SO ORDERED.**                                      **ENTERED: May 3, 2012**

_____
**HON. RONALD A. GUZMAN**
**United States District Judge**